Tagged Opinion



**ORDERED in the Southern District of Florida on January 10, 2008.**

*Laurel M. Obicl*

**Laurel M. Isicoff, Judge**
**United States Bankruptcy Court**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

---

IN RE:                                          CASE NO. 07-15938-BKC-LMI

ASDRUBAL JOSE PARADA and
LOURDES JOSEFA PARADA,                          Chapter 7

                    Debtors.
_____/

### ORDER CONDITIONALLY GRANTING MOTION TO DISMISS

This matter came before me on November 28, 2007 on the U.S. Trustee's Motion to Dismiss Pursuant to 11 U.S.C. §707(b)(1) (CP #34). Having heard presentation of counsel, having considered the evidence presented, and having reviewed the applicable law, I determine for the reasons stated below that dismissal of this case is appropriate unless, within ten days of the entry of this Order, the Debtors move to convert this case to a case under either chapter 11 or chapter 13.

### BACKGROUND FACTS

The following constitute the Court's findings of fact and conclusions of law in accordance with Fed. R. Bank. P. 7052. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A).

The Debtors filed jointly for protection under chapter 7 of the United States Bankruptcy Code on July 30, 2007. The Debtors' Joint Petition (CP #1) indicates their debts are

"Consumer/Non-Business Debts." As required, the Debtors completed Official Form B22A – Chapter 7 Statement of Current Monthly Income and Means-Test Calculation (CP #4) ("Official Form B22A"). Because the Debtors' annualized income exceeds the applicable median family income for Florida, the Debtors were required to complete the entire Official Form B22A. Based on the deductions itemized by the Debtor on Official Form B22A, the presumption of abuse under 11 U.S.C. §707(b)(2) did not arise.

The U.S. Trustee reviewed Debtors' petition, Official Form B22A, the Debtors' bankruptcy schedules, and the Debtors' Statement of Financial Affairs and conducted the section 341(a) meeting of creditors. On October 29, 2007 the U.S. Trustee filed a statement (CP #32) that he had determined a presumption of abuse has arisen in this joint case under 11 U.S.C. §707(b)(2), and subsequently filed the motion to dismiss.

## The Debtors' Assets and Liabilities[1]

The Debtors are married and have no dependents. They live in a rental condominium in Sunny Isles, Florida. On Schedule A the Debtors listed a condominium located in Hollywood, Florida ("the Hollywood Condominium") with a value of $400,000. The Hollywood Condominium is encumbered by a first mortgage in the amount of $488,874 and by other liens. Until June 2007, the Debtors lived in the Hollywood Condominium and claimed it as their homestead property. The Debtors' statement of intention indicates the Debtors are surrendering their interest in the Hollywood Condominium. In late August the secured lender received stay relief to proceed with foreclosure of the Hollywood Condominium.

The Debtors valued their personal property assets at $86,155.45 on Schedule B. Included as an asset is a 2001 BMW 325i Sedan (the "BMW"), which is encumbered by a lien of $19,950. The Debtors listed the current monthly payment as $490.99. According to the statement of

---

[1] The Debtors stipulated to all the facts set forth in the motion to dismiss.

intention, the Debtors are surrendering their interests in the BMW. At the section 341 meeting of creditors, Mrs. Parada testified that the BMW was, in fact, surrendered post-petition to the lender.

The Debtor listed numerous creditors on their schedules. On Schedule F, the Debtors listed $34,618.88 in unsecured claims, primarily consisting of consumer debt.

Mr. Parada is employed as a freight handler with a local company and Mrs. Parada is employed as a billing supervisor for a local law firm. On Schedule I, the Debtors reported monthly gross income of $8,846.01 and monthly payroll deductions of $2,218.32, which include deductions for voluntary 401(k) contributions of $182 and $200 by Mr. and Mrs. Parada, respectively.

### The U.S. Trustee's Determination

The U.S. Trustee argues that the presumption of abuse arises under 11 U.S.C. §707(b)(2) because of three improper deductions on Debtors' Official Form B22A -

- $790 for monthly homeowner association dues for the Hollywood Condominium,

- $1,958.35 for monthly mortgage payments for the Hollywood Condominium, and

- $490.99 per month car payment for the BMW that was surrendered.[2]

According to the U.S. Trustee, the deductions relating to the surrendered car and house are not appropriate because the Debtors will not continue to incur the associated expenses throughout the bankruptcy. The U.S. Trustee argues that when these improper deductions are removed from the Official Form B22A deductions, the presumption of abuse arises because the Debtors' monthly incomes does not "pass" the means test calculation, and indeed, the revised Official

---

[2] This figure reflects the actual monthly payment amount for the BMW listed on the Debtors' Schedules. However, because Official Form B22A requires that future payments on secured debts be averaged over 60 months, the average monthly payment amount scheduled on account of the BMW was $376.42.

Form B22A calculation prepared by the U.S. Trustee indicates the Debtors could pay their unsecured debts in full. (Trustee Exhibit 4 and Exhibit 5.)

Alternatively, the U.S. Trustee argues, even if the Debtors did "pass" the means test, that is, the presumption of abuse did not arise under 11 U.S.C. §707(b)(2), this joint chapter 7 case should nonetheless be dismissed because of abuse based on the totality of the circumstances under 11 U.S.C. §707(b)(3)(B).

## THE MEANS TEST AND THE PRESUMPTION OF ABUSE

Congress substantially revised section 707 when BAPCPA[3] was enacted in 2005. Under revised section 707(b), renumbered 11 U.S.C. §707(b)(1), a case can be dismissed for abuse, rather than substantial abuse, although a debtor is now given the option to convert to a case under chapter 11 or chapter 13 in the face of dismissal. New section 707(b)(2) creates a test (the "means test"), for determining whether there is a rebuttable presumption of abuse. New section 707(b)(3) provides additional criteria for determining abuse when the presumption does not arise under the means test or when the presumption is rebutted. In sum, "BAPCPA provides a two-step process to detect and deter abusive filers:  the … objective means test prescribed in §707(b)(2), and the more subjective test of §707(b)(3) which requires an analysis of the facts of a particular case." *In re Henebury*, 361 B.R. 595, 603-04 (Bankr. S.D. Fla. 2007).

Prior to the enactment of BAPCPA, the law presumed that a debtor filed a case in good faith and the burden was on the trustee to demonstrate the filing constituted a substantial abuse of the Bankruptcy Code. *In re Lenton*, 358 B.R. 651, 656 n.11 (Bankr. E.D. Pa. 2006). *See In re Brown*, 301 B.R. 607 (Bankr. M.D. Fla. 2003). Under the Bankruptcy Code as revised by BAPCPA, however, if the presumption of abuse arises under the means test, the burden is on the debtor to rebut the presumption. If the presumption is not rebutted, dismissal is appropriate. If

---

[3] The Bankruptcy Abuse and Consumer Protection Act of 2005.

the presumption does not arise, or is rebutted, the burden of proof lies with the trustee to show abuse.

The means test calculation of 11 U.S.C. §707(b)(2) is somewhat convoluted, but, in sum, if a debtor's current monthly income ("CMI") is higher than the state median income for a household of the same size, then the debtor must complete the means test calculation in parts IV, V, VI and VII of Official Form B22A. As summarized -

> if after deducting all allowable expenses from a debtor's current monthly income, the debtor has less than $100 per month in monthly net income (*i.e.*, less than $6,000 to fund a 60 month plan), the filing is not presumed abusive. If the debtor has monthly income of more than $166.67, or $10,000 to fund a sixty month plan, the filing is presumed abusive. Finally, if the debtor has between $101 and $166 per month, the case will be presumed abusive if that sum, when multiplied by 60 months, will pay 25% or more of the debtor's non-priority unsecured debts.

*In re Benedetti*, 372 B.R. 90, 92 n.1 (Bankr. S.D. Fla. 2007).

In calculating whether a presumption of abuse arises, section 707(b)(2) of the Bankruptcy Code states, in pertinent part for this case, that allowable deductions to a debtor's CMI "on account of secured debts shall be calculated as … (I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition …." 11 U.S.C. §707(b)(2)(A)(iii). The U.S. Trustee argues that payments on account of debt secured by collateral the Debtors intend to surrender cannot appropriately be deducted from the Debtors' CMI because the debt will not be contractually due "in each month of the 60 months" following the petition date. Debtors, having deducted these payments on the Official Form B22A, disagree.

Thus, the initial dispute in this case is what is the meaning of "amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the

petition." In interpreting the meaning of a statute, one starts with the language of the statute itself. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989); *In re Yates, Inc.*, 256 F.3d 1285, 1288 (11th Cir. 2001). If the statute is unambiguous, there is no reason to look further. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980); *US v. Mount Sinai Med. Ctr. of Fla., Inc.*, 486 F.3d 1248, 1251 (11th Cir. 2007).

The meaning of section 707(b)(2)(A)(iii)(I), and the allowability of deductions on account of assets surrendered post-petition, has been debated by courts since BAPCPA became effective in October 2005. There are two diametrically opposed interpretations of this "unambiguous statute" – one group of cases interprets the statute as requiring that all payments should be deducted, whether or not the debtor actually intends to make the payments; the other group of cases interprets the statute such that these payments may not be deducted.

The first line of cases holds that, based on the "unambiguous" language of the statute, it is clear Congress designed the means test to create a "snapshot" of a debtor's finances on the petition date, calculated in accordance with a fixed formula and without regard to events that may occur after the petition date. As noted by the courts who have adopted the "snapshot" approach, the means test is a mechanical test, based only superficially on a debtor's reality, the purpose of which is to create a bright line presumptive test of eligibility. For example, the means test is based on a debtor's historical income, which may or may not be relevant on the petition date, and based on some actual, but mostly IRS standard, deductions, and, according to the "snapshot" courts, deductions associated with secured payment obligations due at the time the petition is filed.

> [T]he mechanical approach contained in §707(b)(2)(A)(iii) for secured debt payments is consistent with Congress' intent to create a standardized test rather than one based on a debtor's actual circumstances. In fact, the Trustee's interpretation of

> §707(b)(2)(A)(iii) [that debt tied to collateral to be surrendered should not be deducted] is completely contrary to Congress' intent because it requires the kind of case-by-case adjustment based on a debtor's individual circumstances for the presumption of abuse that Congress rejected.

*In re Randle*, 358 B.R. 360, 364 (Bankr. N.D. Ill. 2006). *See In re Benedetti*, 372 B.R. at 96 ("[I]f Congress intended to limit secured debt payments contractually due from debtors on the petition date to those where actual future payments will be made in Form B22C calculations, it knew how to do so, as reflected by the inclusion of the terms 'actual monthly expenses' and 'actual expenses' elsewhere within 11 U.S.C. §707(b)(2)(A)(ii)(I) and (II)." (*quoting In re Oliver*, 2006 WL 2086691 at *3 (Bankr. D. Or. 2006))); *In re Walker*, 2006 WL 1314125 (Bankr. N.D. Ga. 2006); *In re Hartwick*, 352 B.R. 867, 870 (Bankr. D. Minn. 2006) ("Application of the means test is not left by the BAPCPA legislation to judicial discretion."), *aff'd in relevant part, rev'd in part, sub nom. Fokkena v. Hartwick*, 373 B.R. 645, 654 (D. Minn. 2007) ("[T]he plain language of §707(b)(2)(A)(iii) dictates that a debtor must be permitted to deduct secured payments on property even if that debtor intends to surrender that property post-petition.").

The other line of cases interprets the "unambiguous" language of section 707(b)(2)(A)(iii)(I) to mean that only those expenses that the debtor reasonably expects to be paid during the next sixty months may be appropriately deducted, and that it is inappropriate to deduct from disposable income payments for collateral that will be surrendered.

> It … seems that the better construction of "scheduled as contractually due" would consider the debtors' intention to surrender the collateral and make no future payments to the creditor. This construction would not support deduction of average secured credit payments on debt secured by collateral that the debtor proposes to surrender. This construction is also in keeping with the overall purpose of establishing a formula that will give rise to a meaningful presumption of abuse or not.

*In re Ray,* 362 B.R. 680, 685 (Bankr. D. S.C. 2007). *See In re Harris*, 353 B.R. 304 (Bankr. E.D. Okla. 2006); *In re Skaggs*, 349 B.R. 594 (Bankr. E.D. Mo. 2006).

Having reviewed the cases cited above, and having considered the unambiguous language of the statute, I believe that those cases adopting the "snapshot" approach correctly interpret the statute. I am reminded that "[t]he Supreme Court and [the Eleventh Circuit] have warned on countless occasions against judges 'improving' plain statutory language in order to better carry out what they perceive to be the legislative purposes." *In re Bracewell*, 454 F.3d 1234, 1240 (11th Cir. 2006) (*citing Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004)). Thus, as held by Judge Cristol in *In Re Benedetti*, I similarly "will allow, for purpose of the means test calculation, a deduction from CMI for amounts that would have been due, but which [Debtors] may not pay, to secured creditors on account of property [they intend] to, and in fact [do] surrender after the petition date." 372 B.R. at 97.

Accordingly, I find the presumption of abuse under 11 U.S.C. §707(b)(2) has not arisen in this case.

## THE TOTALITY OF CIRCUMSTANCES AND DISMISSAL

The U.S. Trustee also seeks dismissal under 11 U.S.C. §707(b)(3), arguing that the totality of circumstances of the Debtors' financial situation demonstrate abuse.[4] 11 U.S.C. §707(b)(3) provides

> In considering under paragraph (1) whether the granting of relief
> would be an abuse of the provisions of this chapter in a case in

---

[4] Some courts have held, once a debtor has "passed the means test," the debtor's ability to pay is irrelevant in determining whether dismissal is appropriate under 11 U.S.C. §707(b)(3)(B). *See, e.g.*, *In re Nockerts*, 357 B.R. 497 (Bankr. E.D. Wis. 2006). However, the majority of the courts have rejected that argument, noting that the language of 11 U.S.C. §707(b)(3) – "in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted" – unambiguously presupposes the debtor has "passed" the means test. *See, e.g. In re Lenton*, 358 B.R. 651. The Debtors made no such argument in this case.

> which the presumption in subparagraph (A)(i) of such paragraph
> does not arise or is rebutted, the court shall consider –
>
> (A) whether the debtor filed the petition in bad faith, or
>
> (B) the totality of the circumstances … of the debtor's financial
> situation demonstrates abuse.

In response to the argument of the U.S. Trustee, the Debtors argue that there are circumstances, beyond the Debtors' post-petition ability to pay, that I must consider in determining whether dismissal is appropriate. The Debtors proffered evidence that a prior reconciliation was unsuccessful, they now plan to divorce, and, as soon as their current lease expires in May, 2008, they will cease living together, thus increasing their monthly living expenses. The Debtors also argue they did not run up credit card debt, fail to disclose assets, or do other "bad acts" that warrant dismissal. Accordingly, Debtors argue, the totality of circumstances, including, but not limited to, their finances, weigh against dismissal.

In *In re Henebury*, 361 B.R. 595, the joint debtors made a similar argument – that is – that the court must consider the debtors' ability to pay as only one of many factors, and that the ability to pay cannot be the sole factor in determining the totality of the circumstances for dismissal under 11 U.S.C. §707(b)(3)(B). In rejecting the debtors' argument, Chief Judge Hyman summarized the conflicting case law on this issue. Noting, as do I, the express language of 11 U.S.C. §707(b)(3)(B), Chief Judge Hyman wrote:

> [P]re-BAPCPA substantial abuse cases speak generally of the
> "totality of the circumstances test." In contrast, post-BAPCPA
> §707(b)(3)(B) specifically delineates the pertinent inquiry as the
> "totality of the circumstances of the debtor's financial situation[."]
> Thus, the debtor's total financial situation as a measure of ability to
> pay, and bad faith are separate and sufficient grounds for dismissal.
> Either ability to pay or bad conduct in connection with the
> bankruptcy will warrant dismissal for abuse under §707(b)(3).

*Id.* at 607 (citations omitted). Determination of abuse under section 707(b)(3)(B) solely considers circumstances relating to a debtors' financial situation. Consideration of the lack of indicia of bad faith and other factors unrelated to a debtor's financial situation are not relevant to consideration under the totality of the circumstances test of 11 U.S.C. §707(b)(3)(B), rather, they are relevant to determining abuse under the bad faith standard of 11 U.S.C. §707(b)(3)(A).

The U.S. Trustee has stated unambiguously, and I have no basis to find otherwise,[5] that the Debtors did not file this case in bad faith. There are no allegations or evidence that the Debtors made on-the-eve-of-bankruptcy purchases, filed incomplete or false schedules, or failed to cooperate with the bankruptcy trustee, which are all examples of factors courts considered pre-BAPCPA in determining the existence of "substantial abuse," and which criteria most courts have agreed are still relevant in determining abuse under sections 707(b)(1) and 707(b)(3)(A). *See In re Figueroa*, 376 B.R. 627, 629 (Bankr. N.D. Ohio 2007); *In re Henebury*, 361 B.R. at 604; *In re Pak*, 343 B.R. 239, 243 (Bankr. N.D. Cal. 2006). Accordingly, I find the only facts relevant to my consideration of whether the totality of the circumstances of this case demonstrates abuse are those relating to the Debtors' financial situation.

Having determined that the only relevant factors are those relating to Debtors' financial situation, I must then determine an issue similar to that faced by Chief Judge Hyman in *Henebury* –whether, and in what time frame, I should consider post-petition events, in making a determination under section 707(b)(3)(B). In *Henebury* Chief Judge Hyman had to determine whether he should consider any post-petition events relating to the debtors' financial situation or only those events existent on the petition date. In the case before me, all parties agree that post-

---

[5] *See, e.g., In re Richie*, 353 B.R. 569 (Bankr. E.D. Wis. 2006) (The U.S. Trustee filed a motion to dismiss under 11 U.S.C. §707(b)(3)(B), arguing the debtor had the ability to work but refused to work outside her field. The court dismissed the case under 11 U.S.C. §707(b)(3)(A) stating the debtor's inability to repay her debts was self-imposed and therefore constituted bad faith.).

petition events are relevant. The issue then, in this case, is at what point are the post-petition events related to the Debtor's financial situation no longer relevant in determining whether dismissal is appropriate.

In *Henebury*, Chief Judge Hyman considered several post-petition events relevant to his determination that the debtors' chapter 7 filing constituted abuse under 11 U.S.C. §707(b)(1). First, the debtor wife was unemployed as of the petition date but knew that she would soon be starting a new job; she did, in fact, start a new job approximately one week later. Second, the Heneburys listed in their Official Form B22A mortgage deductions for a home in which they no longer lived. Although the Heneburys still owned the home at the time of the hearing on the motion to dismiss, they intended to sell it and were no longer making the mortgage payments. Finally, the Heneburys listed costs associated with a time-share unit, the obligation for which the court did not allow the Heneburys to assume. However, that ruling occurred several months after the Heneburys filed their petition.

In finding abuse under the totality of the circumstances,[6] Chief Judge Hyman relied heavily on the pre-BAPCPA case *U.S. Trustee v. Cortez (In re Cortez)*, 457 F.3d 448 (5th Cir. 2006). In *In re Cortez* the Debtors filed their chapter 7 petition when Mr. Cortez was unemployed. However, approximately four days after the petition was filed Mr. Cortez was offered a job that paid $95,000 a year. It appears, based on Mr. Cortez' disclosure in Schedule I,[7] that at the time the petition was filed Mr. Cortez had a reasonable expectation he was going to start a job post-petition, but the bankruptcy court found Mr. Cortez did not know for certain

---

[6] The U.S. Trustee did not argue, and so Chief Judge Hyman did not address, any issue regarding presumption of abuse under section 707(b)(2).

[7] Schedule I directs a debtor to disclose reasonably anticipated increases or decreases in income in the 12 months following the petition date.

whether he would start a new job. The Fifth Circuit determined that, pre-BAPCPA, section 707[8] clearly contemplated post-petition events in considering substantial abuse (the pre-BAPCPA standard) because the Bankruptcy Code specifically admonishes the court <u>not</u> to take into account "whether a debtor has made, or continues to make, charitable contributions." The Fifth Circuit held that the "relief" referred to in former 11 U.S.C. §707(b) was the chapter 7 discharge and, therefore, a court may consider any facts that arise prior to the entry of a discharge in determining substantial abuse. Accordingly, the Fifth Circuit ruled that dismissal of the Cortezes' bankruptcy case under 11 U.S.C. §707(b)(1) was appropriate.[9]

In further support of his holding that the court may consider post-petition events in determining abuse, Chief Judge Hyman noted new language in section 707(b)(3)(B) that directs the reviewing court to note "whether the debtor seeks to reject a personal services contract," which, obviously, is an event that could only occur post-petition. Finally, Chief Judge Hyman reviewed the holdings of several post-BAPCPA cases, each of which determined that, in assessing the totality of circumstances of a debtor's financial condition, it is appropriate to consider post-petition events that occur up to the hearing on the motion to dismiss. *See, e.g.*, *In re Richie,* 353 B.R. 569 (Bankr. E.D. Wis. 2006); *In re Pennington*, 348 B.R. 647 (Bankr. D. Del. 2006). These circumstances include those that would adversely impact a debtor's financial condition as well as those that would enhance a debtor's financial condition. *See In re Cortez*, 457 F.3d at 459 (The court remanded the case to the bankruptcy court with instructions to "consider any post-petition events affecting the Cortezes' financial situation, including any post-

---

[8] 11 U.S.C. §707(b), pre-BAPCPA, provided that "[a]fter notice and a hearing, the court … may dismiss a case filed by an individual debtor under this chapter … if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter…. In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions."

[9] Ironically, while the *Cortez* case was moving through the appeals process Mr. Cortez lost his job, and was unemployed at the time the Fifth Circuit ruled.

petition improvements in income, or, if still applicable, Mr. Cortez' unemployment."). *Accord In re Richie*, 353 B.R. 569 (it is a debtor's ability or inability to pay at the time of the hearing on the motion to dismiss, not on the petition date, that is relevant in determining whether dismissal is appropriate under the totality of the circumstances.)

Having reviewed the *Henebury* opinion, the cases cited by Chief Judge Hyman, as well as cases with contrary findings, I am persuaded by Chief Judge Hyman's analysis and holding. I agree that it is appropriate to consider post-petition events in viewing the totality of the circumstances of the debtor's financial situation. The post-petition circumstances that a court can and may consider in determining abuse under 11 U.S.C. §707(b)(3)(B) must be considered in a set time frame, one that offers a greater degree of certainty than the *In re Cortez* date of a hypothetical discharge that may never come. Therefore, I hold that the cut-off date for determination of relevancy is the date of the hearing on the motion to dismiss.

## THE DEBTORS' FINANCIAL SITUATION

I must now determine, based on the Debtors' financial situation at the time of the hearing on the motion to dismiss, whether the totality of circumstances in this case "demonstrates abuse." In determining whether a debtor's financial situation demonstrates abuse, or, pre-BAPCPA, substantial abuse, virtually all courts have applied a test that analyzes "whether the debtor has sufficient projected disposable income to fund a hypothetical [c]hapter 13 case." *In re Henebury*, 361 B.R. at 611.[10] *See In re Leung*, 311 B.R. 626 (Bankr. S.D. Fla. 2004); *In re Brown*, 301 B.R. 607.

In determining the feasibility of a chapter 13 bankruptcy plan, a court is bound to review a debtor's "projected disposable income." 11 U.S.C. §1325(b)(1)(B). Whatever method is used

---

[10] Chief Judge Hyman thoroughly reviewed the case law on this issue. I see no need to repeat or duplicate his analysis.

to determine a debtor's "projected disposable income," all courts analyzing income review the facts at the time of plan confirmation, not facts that are unknown or highly speculative. Indeed, 11 U.S.C. §1329 governing modification of chapter 13 plans is consistent with this approach. A chapter 13 plan may be modified based on changed circumstances, which, pre-BAPCPA, the majority of courts required be "substantial and unanticipated." *See, e.g., In re Woodhouse*, 119 B.R. 819 (Bankr. M.D. Ala. 1990); *In re Euler,* 251 B.R. 740 (Bankr. M.D. Fla. 2000). *But see Matter of Witkowski,* 16 F.3d 739 (7th Cir. 1994); *Itule v. Heath (In re Heath)*, 182 B.R. 557 (B.A.P. 9th Cir. 1995) (holding that since 11 U.S.C. §1329 does not include a requirement of "substantial or unanticipated" changes, courts should not impose such a condition).

In determining the Debtors' "projected disposable income," and therefore their ability to pay all or a portion of their debts, I must look at the Debtors' projected income over the next 60 months.[11] There are two primary methods used by courts to determine a debtor's "projected disposable income" under the totality of the circumstances analysis, one based on the debtor's CMI, *see, e.g., In re Alexander*, 344 B.R. 742 (Bankr. E.D.N.C. 2006), the other based on the debtor's net income taken from actual anticipated income and expenses during the chapter 13, *see, e.g. In re Arsenault,* 370 B.R. 845 (Bankr. M.D. Fla. 2007).[12] Using the Debtors' current CMI of negative $747.57 and, from Schedules I and J, net income of $419.74, it appears that the method employed will dictate the result. However, the U.S. Trustee raised objections to certain deductions made on the Debtors' means test and the schedules, which objections, if appropriate, would eliminate the disparate results of two methodologies.

---

[11] The Debtors' CMI on Official Form B22A exceeded the median family income, and therefore, under a chapter 13 plan, their "applicable commitment period," that is the amount of time the Debtors would be required to make payments to unsecured creditors, would be five years, 11 U.S.C. §1325(b)(4)(A)(ii), unless the Debtors were able to pay in full "all allowed unsecured claims over a shorter period." 11 U.S.C. §1325(b)(4)(B).

[12] *See generally* 6 Keith M. Lundin, Chapter 13 Bankruptcy §§467.1 - 492.1 (3d ed. 2000 & Supp. 2007-1).

The U.S. Trustee argues that, in calculating the Debtors' ability to pay their unsecured debt under 11 U.S.C. §707(b)(3), the Debtors may not take into account the payments associated with the surrendered home and car. I agree. Although these payments were properly deducted for purposes of the means test, when determining the Debtors' projected disposable income, it is appropriate to exclude these deductions as the payments clearly will not be made going forward, and therefore will not negatively impact the Debtors' disposable income.

The U.S. Trustee also contests the Debtors' deduction of voluntary 401(k) contributions on Schedule I. Case law supports the U.S. Trustee's argument that, absent special circumstances, voluntary contributions to a 401(k) should not be considered reasonably necessary expenses under the totality of the circumstances analysis. *See In re Behlke*, 358 F.3d 429 (6th Cir. 2004*); In re Zaporski*, 366 B.R. 758 (E.D. Mich. 2007); *In re Cox*, 249 B.R. 29 (Bankr. M.D. Fla. 2000). C*f. In re Mills*, 246 B.R. 395 (Bankr. S.D. Cal. 2000) (finding that a 56 year old debtor who had a balance of $9,000 in his 401(k) and was making modest contributions of 10% of his income was allowable as a necessary expense). Bankruptcy courts, while recognizing that saving money for retirement certainly is a prudent investment, have consistently held that debtors should not be permitted to pay themselves money at the expense of creditors. *In re Dorwarth*, 258 B.R. 293, 295-296 (Bankr. S.D. Fla. 2001); *In re Cox*, 249 B.R. at 32. *See also In re Behlke*, 358 F.3d 429, 435 (6th Cir. 2004); *In re Zaporski*, 366 B.R. 758, 773 (E.D. Mich. 2007). These Debtors are young and, hopefully, will have many years of gainful employment to work towards retirement. Under the circumstances of this case, it is not appropriate for these Debtors to deduct their 401(k) contributions in computing "projected disposable income."

It is not necessary for me to decide whether the CMI method or net income method is the correct one for determining debtors' "projected disposable income" because, after taking out the

excluded deductions, both methods indicate the Debtors have sufficient income to repay 100% of their unsecured debt in less than five years. Based on the CMI method, after the payments associated with the former homestead and the BMW are eliminated, the Debtors' projected disposable monthly income is $2,368.45, or $142,107 over the applicable 60 month period. Based on the net income method, after eliminating the former homestead expenses, BMW payments, and 401(k) deductions, the Debtors' projected disposable monthly income is $1,470.61, or $88,236.60 over 60 months.

The Debtors also have highlighted certain factors that are relevant to the Debtors' financial situation that they argue I should take into consideration in determining the totality of the circumstances. The Debtors have proffered their reconciliation has failed, and in May 2008 they intend to move out of their current apartment and seek separate apartments. While the change in living arrangements was anticipated at the time of the hearing on the motion to dismiss, these facts cannot be factored into my determination. Neither the fact of the move, nor, more significantly, the financial impact of the move, is currently verifiable. It could be that, should the Debtors' fail to reconcile again, their separate living arrangements may cost less than their current living arrangements. The Debtors provided no evidence of what would be the cost of separate living arrangements. *See In re Lenton*, 358 B.R. 651 (the court declined to consider what a new car would cost, even though all parties agreed the debtor would need to purchase a new car within the time frame used by the court to determine the debtor's ability to fund a chapter 13 plan, because the debtor presented no evidence on the anticipated expense, and therefore the court could not determine what would be the impact of such expense on funds that would otherwise be available to pay unsecured debt). Moreover, the Debtors could, in fact, reconcile again between now and May. Accordingly, I will not consider these circumstances in

determining the Debtors' financial situation because the time frame is too remote, therefore making the reliability of the event less probable and there is no evidentiary support to quantify the financial impact of separate living.

Because, the U.S. Trustee has demonstrated that, based on the totality of the circumstances of the Debtor's financial situation, the Debtors are abusing the Bankruptcy Code, the Bankruptcy Code directs that the Debtors are not entitled to chapter 7 relief. However, because there is no evidence that the Debtors have sought bankruptcy relief in bad faith, *see Marrama v. Citizens Bank of Mass.*, 127 S. Ct. 1105, 166 L. Ed. 2d 956 (2007), they should be allowed to seek relief under the appropriate chapter if they so choose.

It is accordingly ORDERED and ADJUDGED that

1.    The U.S. Trustee's motion to dismiss is granted.

2.    This case will be dismissed unless, within ten days of entry of this Order, the Debtors convert this case to a case under chapter 11 or chapter 13 of the Bankruptcy Code.

###

Copies furnished to:
Ariel Rodriguez, Esq.
James Schwitalla, Esq.

*Attorney Rodriguez shall serve a conformed copy of this order upon all parties in interest and shall file a Certificate of Service of same with the Clerk of the Court.*